UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JERI L. GATES,                )
                              )
         Plaintiff,           )
                              )
    v.                        )   Case No. 04-1160
                              )
CATERPILLAR, INC.,            )
                              )
         Defendant.           )

## O R D E R

This matter is now before the Court on Defendant, Caterpillar's ("Caterpillar"), Motion for Summary Judgment. For the reasons set forth below, Caterpillar's Motion for Summary Judgment [#17] is GRANTED.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Complaint present federal questions under Title VII, 42 U.S.C. § 2000e, et seq.

### FACTUAL BACKGROUND

In 1978, Plaintiff, Jeri Gates ("Gates"), was hired by Caterpillar as a clerk. From 1978 until 1990, she held various administrative positions with the company. In 1990, Gates became an Assistant Contract Administrator within the New Technology Department ("NTD") of Caterpillar's Technical Services Division ("TSD"). She then became a Contract Administrator in 1997, which made her responsible for overseeing contracts between Caterpillar and its customers. Among other things, this included making sure that contracts were completed correctly and on time, as well as "closing out" contracts by verifying that

the specified equipment was delivered, confirming receipt of payment, and ensuring that both Caterpillar and the customer agreed that the contract was complete.

In late 2001 and early 2002, the NTD was reconfigured. Randall Richards ("Richards"), the Technology Manager, took over the department, including its Contract Administrators, and added several new Assistant Contract Administrators. Richards attempted to evaluate the department's workload/performance and integrate the new employees into the department. As part of this process, Richards sought input from Gates, and the two of them worked closely during this time. Through the evaluation process, Richards decided to give Gates a bigger role in the department, since she was the most experienced employee in the group. Specifically, he wanted to move her to a Team Leader role, which would put her in the position of administering contracts, delegating, and managing the work of others in the department. Richards repeatedly offered Gates the Team Leader opportunity, but she declined. The parties dispute whether the Team Leader role would have resulted in a higher job classification for Gates.

Gates became increasingly dissatisfied in her position and complained to Richards about the lack of growth opportunities in the NTD, suggesting that she was up against a glass ceiling. Richards attempted to dissuade her from leaving the department and alluded that there would be new opportunities for her within the department. Gates subsequently had several meetings with Barbara Shane ("Shane"), the Personnel Services Supervisor in the TSD, Mike Simmons ("Simmons"), the Manager over the NTD, and Richards to discuss her workload concerns, which resulted in Gates being assigned as the Training Leader for the department.

Around this same time, co-workers began to mention to Richards that Gates spent a lot of time on personal phone calls. Richards relayed these concerns to Shane, who assigned Amy Winkler ("Winkler"), a Personnel Associate in the Human Resources Department, to investigate Gate's telephone and internet usage. At that time, Caterpillar employees were not prohibited from using its telephone system for personal use as long as the use was not abusive. Caterpillar's Electronic Communications Policy provided that personal use of the Company's communications equipment should be limited and subject to the exercise of good judgment and discretion. It specifically prohibited messages and solicitations regarding commercial, religious or political causes or non-work related solicitations, as well as usage that is illegal, harassing, discriminatory, offensive to others, sexually explicit, or which negatively affects an employee's productivity.

A report concerning Gate's phone usage covered 89 work days between December 15, 2001, and May 7, 2002. During this period, there were 489 phone calls, including numerous calls to Gates' then-fiancé, fellow Caterpillar employee Brad Gates. A report concerning her internet usage from January 10, 2002, to April 30, 2002, Gates made approximately 2,700 hits on the internet to Bradley University and approximately 316 hits to other websites that did not appear to be business related. These reports were reviewed by Shane and Richards, both of whom believed the reports to be accurate.

Subsequently, Shane, Richards, Winkler, and Randy Koors ("Koors"), Business Support Manager in the TSD Support Services Department, discussed taking disciplinary action against Gates. Koors joined the meeting because he was scheduled to take over the contract administration responsibilities in the NTD. Shane recommended to Richards that Gates be suspended, and Richards ultimately made the decision to suspend her. As

a result, Richards and Shane met with Gates on May 24, 2002, and presented her with an Employee Action Plan ("EAP"). Gates admitted making the phone calls and noted that most of her personal calls were to her fiancé.

The EAP stated that the reasons for the suspension were "[m]isuse of Company time, equipment, & electronic communications" and failure to take responsibility for her work assignments. The EAP further provided that during the suspension, "She will only have contact with her current supervisor, if needed, and will refrain from contacting other team-members and employees at TSD regarding this matter." Richards orally reiterated the directive, stating, "you understand, you are only to contact me, you are not to contact any of your other team members within Caterpillar." The EAP ended with the admonition that "[f]ailure to adhere to the policies specifically noted above, as well as, any other company policies will result in termination."

While on suspension, Gates sent an e-mail to Richards through Caterpillar's e-mail system protesting her suspension. As he was unaware that Gates had access to the system during her suspension, Richards wondered how she had sent her e-mail. Subsequent investigation revealed that Gates was using Caterpillar's system from outside the Company to send e-mails to individuals other than Richards. Gates used her fiance's I-Pass card to access Caterpillar's network from her fiance's home computer, despite the fact that I-Pass cards are intended and authorized for use only by the employee to and for whom they are issued. She sent e-mails to various Caterpillar customers, contractors, and colleagues at other companies to solicit their opinions on how long it took to close out contracts. Gates admits that she was soliciting the information to support her position that

the schedule presented to her by Richards was unreasonable and to thereby rebut her EAP.

Gates returned from her suspension on June 3, 2002. That day, she met with Shane, Richards, and Koors to discuss her conduct during her suspension. Gates presented a written rebuttal of the EAP. She was informed that Caterpillar knew that she had accessed its computer systems during her suspension and asked how she had done so. Gates initially stated that her fiancé had logged into the system from home before leaving for work in the morning and that she had then used her own e-mail password to get into the e-mail system. Shane determined that at nearly all of the times that Gate's fiancé had allegedly accessed the system remotely, he was already physically at work. Gates then admitted that she had used her fiance's I-Pass card. After further discussion, Caterpillar placed her on disciplinary leave pending further discipline.

Shane and Richards concluded that Gates had lied about how she accessed Caterpillar's network and had violated the EAP by her conduct. Shane recommended that Gates be terminated, and Richards made the decision to terminate her employment. Caterpillar contends that Shane and Richards made their determinations based on their good faith beliefs that Gates had continued to misuse Company property and had engaged in dishonesty when questioned about sending the e-mails during her suspension. Gates was notified of her termination in a letter dated June 5, 2002.

On May 19, 2004, Gates brought this action alleging that she was the victim of unlawful sexual discrimination and retaliation. Caterpillar has now moved for summary judgment. The matter is fully briefed, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## DISCUSSION

I.  <u>Disparate Treatment</u>

Title VII prohibits employers from discriminating "against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 106 S.Ct. 2399, 2404 (1986). Under Title VII, the plaintiff is required to establish that he has been the victim of intentional discrimination. <u>Mojica v. Gannett Co., Inc.</u>, 7 F.3d 552, 561 (7th Cir. 1993). The plaintiff may present direct proof of discrimination, <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775 (1989), or may rely on indirect evidence using the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973), burden shifting method of proof.

Having no direct evidence of sexual discrimination, Gates must proceed under the <u>McDonnell Douglas</u> burden-shifting analysis. Under this analysis, Gates must carry the initial burden of establishing a prima facie case of discrimination by showing: 1) she was a member of a protected class; 2) she was performing her job satisfactorily or meeting her employer's legitimate performance expectations; 3) she was subjected to a materially adverse employment action; and 4) others outside of the protected class were treated more favorably. <u>McDonnell Douglas</u>, 411 U.S. at 802; <u>St. Mary's Honor Center v. Hicks</u>, 113 S.Ct. 2742, 2747 (1993); <u>Gonzalez v. Ingersoll Milling Machine Co.</u>, 133 F.3d 1025, 1032 (7th Cir. 1998); <u>Hoffman-Dombrowski v. Arlington International Racecourse, Inc.</u>, 254 F.3d 644, 650 (7th Cir. 2001). While Caterpillar does not contest Gates' ability to satisfy the first and third prongs of this analysis, her compliance with the second and fourth criteria is challenged.

Gates offers evidence that she received a favorable employment evaluation in January 2002 and shortly thereafter received an email from Richards complimenting her on her performance, in an attempt to establish that her performance was at least adequate under Caterpillar's expectations. However, this assertion misses the point, as the critical inquiry is whether she was meeting Caterpillar's reasonable expectations at the time that she was disciplined. At that time, Caterpillar had reports indicating that she had made a total of 432 calls during an 89-day period, 432 of which Caterpillar had identified as personal calls, and had averaged 28 minutes of internet usage per day, including 2,700 hits on the Bradley University website and 316 hits to other websites that did not appear to be business related. While she may attempt to explain or qualify the figures, she essentially admits to having made the number of telephone calls and internet hits indicated in Caterpillar's reports. Nor does she contest that she used Caterpillar's computer network to e-mail someone other than Richards during her suspension for purposes of gathering data to challenge her suspension and initially gave a false or deliberately misleading response when questioned about this conduct. The fact that Gates generally received a good performance evaluation and complimentary e-mail in mid-January 2002 and was otherwise a good employee does not change the fact that she admits having engaged in the actionable conduct that culminated in her suspension and termination. Furthermore, this evaluation and praise occurred roughly three months prior to the time that Shane received Gates' phone and internet usage reports in mid-April 2002. The Court would also note that Richards issued the favorable evaluation and praise months after Gates purportedly complained by commenting that she should receive the same salary classification as Heisel and on or around the same day that she complained about feeling

that she was being held in the contract administration unit and that he "wouldn't expect a man to remain in that type of job for so long."  See Leffel v. Valley Financial Services, 113 F.3d 787, 795 (7th Cir. 1997) (finding that previous satisfactory performance reviews did not "call into question the criticisms that culminated in her discharge.")  Thus, the Court finds that Gates has failed to create a genuine issue of material fact with respect to the second prong of her prima facie case.

In order to survive summary judgment, Gates must also establish that similarly situated employees outside of the protected classes were treated more favorably.  While a complete identity is not required in order for employees to be similarly situated, a plaintiff must show "a 'substantial similarity' between their positions, such as a common supervisor and similar standards governing their performance."  Adams v. Triton College, 35 Fed.Appx. 256, 2002 WL 850391, at *260 (7th Cir. April 29, 2002), citing Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).

Gates first argues that many employees at Caterpillar made personal calls or used the internet for non-business-related purposes.  However, even assuming that this evidence could competently support the assertions being made, she has missed the point.  The issue under the fourth prong of the McDonnell Douglas inquiry is not whether she was aware of any other instances where an employee may have used company resources for personal purposes.  Rather, it is whether Caterpillar had knowledge of any such conduct at a level deemed abusive in light of the company's policy on such usage by a similarly situated individual who was not a member of her protected class and treated that individual more favorably than Gates (i.e., the individual was not suspended or terminated).

In an attempt to demonstrate comparable employees with respect to her suspension, Gates identifies Tom Cox, a non-union employee in the TSD, who received a three-day suspension for improper use of Caterpillar's internet. She argues that prior to receiving this suspension, he had been repeatedly counseled and warned about his improper internet usage. The next employee offered is a male TSD employee who was given a written warning for misusing the computer system by visiting non-related websites during work time. Gates also contends that a male TSD employee received a five-day suspension for falsifying time records.

With all due respect, Gates has not demonstrated that any of these individuals were similarly situated, as she has made no effort to establish that any of them "dealt with the same supervisor, were subject to the same performance standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Peele v. Country Mutual Ins. Co., 288 F.3d 319, 330 (7th Cir. 2002); Radue, 219 F.3d at 617-18. The only attempt to tie them all together is the assertion that they were disciplined through proceedings in which Shane was involved, yet Gates has not alleged, much less introduced evidence indicating that Shane, a female, bore any discriminatory or retaliatory animus based on her gender.

There is no suggestion that any of the three male employees reported to Richards, the supervisor alleged to have suspended and terminated her based on her gender, or that either of the two males that were disciplined for inappropriate internet usage also engaged in excessive use of the phones for personal calls. The third male did not even engage in functionally equivalent misconduct. Although Gates indicates that Cox was disciplined for improper internet usage and that the total logged time was over 100 hours, she makes no

attempt to state the length of time over which this usage occurred or the frequency with which the inappropriate hits were made. The scant information that she provides for each of the three males, which makes no real effort to quantify the frequency or severity of the misconduct, is simply insufficient to permit any reasoned inquiry into whether the individuals were truly similarly situated. See Vanasco v. National-Louis University, 137 F.3d 962, 967 (7th Cir. 1998).

Gates makes no attempt to identify similarly situated males with respect to the decision to terminate her employment. She has introduced no evidence suggesting that a similarly situated male was believed to have engaged in additional misconduct while on a suspension and lied when confronted about this misconduct upon his return yet was not terminated as a result. Consequently, Gates has failed to satisfy the fourth requirement for a prima facie case under the indirect method as well.

As Gates has failed to meet her burden of demonstrating that she was satisfactorily performing her job pursuant to Caterpillar's legitimate expectations or that any similarly situated employees outside of the protected classes were treated more favorably, she has necessarily failed to present a prima facie case of sexual discrimination under Title VII. Caterpillar is therefore entitled to summary judgment on the disparate treatment claims alleged in the Complaint.

II.     Retaliation

Title VII provides in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or

> participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Under the direct method for proving retaliation, a plaintiff must present direct evidence of: (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two. Stone v. City of Indianapolis Pub. Utils. Div., 280 F.3d 640, 644 (7th Cir. 2002); Rhodes v. Illinois Department of Transportation, 359 F.3d 498, 508 (7th Cir. 2004); Williams v. Waste Management of Illinois, 361 F.3d 1021, 1031 (7th Cir. 2004). Although other formulations of a prima facie case of retaliation have been used in the past, the Seventh Circuit has clarified that an indirect prima facie case of retaliation requires the following showing:

> [A]n employee must demonstrate that: (1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite meeting [his] employer's legitimate expectations, [he] suffered a materially adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

Hilt-Dyson v. City of Chicago, 282 F.3d 456, 465 (7th Cir. 2002), *citing* Stone, 280 F.3d at 644; Spencer v. Thomas, 2002 WL 378179, at *3 (7th Cir. March 7, 2002); Haywood V. Lucent Tech., Inc., 323 F.3d 524, 531 (7th Cir. 2003). In the absence of direct evidence, "failure to satisfy any element of the prima facie case proves fatal to the employee's retaliation claim." Hilt-Dyson, 282 F.3d at 465. If the plaintiff establishes a prima facie case through the indirect method, the defendant may then come forward with a legitimate, non-invidious reason for the adverse action. Haywood, 323 F.3d at 531. "Once the defendant presents a legitimate non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." Id.

Gates asserts that she can proceed under the direct method by offering a convincing mosaic of circumstantial evidence, which is similar to the way the direct method operates in disparate treatment cases. However, she is mistaken. In <u>Stone</u> and its progeny, the Seventh Circuit has repeatedly clarified that in pursuing retaliation claims under the direct method, a plaintiff must present direct evidence, that is an acknowledgment of discriminatory intent that does not require support from inferences. 281 F.3d at 64. "We held in <u>Stone</u> that inferences and circumstantial evidence cannot be used to establish a prima facie case for retaliation under the direct evidence test." <u>Hudson v. Chicago Transit Authority</u>, 375 F.3d 552, 560 (7th Cir. 2004). As she has not presented any direct evidence of retaliation, Gates must therefore proceed under the indirect method.

Caterpillar asserts that Gates' retaliation claim must fail because she did not engage in any statutorily protected activity. Specifically, Caterpillar contends that she never even complained of sex discrimination, much less filed any charge with the EEOC.

Gates cites several instances of conversations that she had with Richards and/or Shane as evidence of protected activity. In August 2001, Gates told Richards that she did not think that it was fair that Kent Heisel ("Heisel"), who she believed to perform similar duties in another unit within the company, was in a higher salary classification. In January 2002, she informed Richards that she wanted to move on in the company, that she felt as though she was subject to a "glass ceiling" holding her in the contract administration unit, and that she felt she had been held in her position too long and was not going to put up with it any longer. Gates also claims to have told Richards, "you wouldn't expect a man to remain in that type of job for so long." In February 2002, after Richards offered her the team leader position, she told him that "if she had been an 'engineer' she would already be

in a higher classification given the nature of her responsibilities." In March 2002, Gates sent Shane an email stating that if things did not get better she would have no choice but to "go to the next step (whatever that is)."

Title VII protects an employee from "retaliation for complaining about the types of discrimination it prohibits." Hamm v. Weyauwega Milk Products, Inc., 332 F.3d 1058, 1066 (7th Cir. 2003), *citing* Miller v. American Family Mutual Ins. Co., 203 F.3d 997, 1007 (7th Cir. 2000). While an employee need not use magic words like "sex" or "gender discrimination" in order to invoke the protections of Title VII, "she has to at least say something to indicate her [gender] is an issue." Sitar v. Indiana Dept. of Transportation, 344 F.3d 720, 727 (7th Cir. 2003). An employee may honestly believe that she has suffered discrimination, but if she never mentions it, "a claim of retaliation is not implicated." Id., *citing* Miller, 203 F.3d at 1008.

Here, Gates complained about several issues relating to her position, including the amount of work, her desire to transfer, her job classification, and the operation of the department. With the exception of the alleged statement that Richards would not have expected a man to have stayed in her position for so long, none of these complaints expressly invoked her gender or suggested that she believed that these problems existed because she was a woman.[1] However, this statement is an improper attempt to avoid the

---

[1] Although one comment included the use of the phrase "glass ceiling," the Court does not find that such a term is an obvious synonym for gender discrimination. While the term may be used to refer to gender, it is also commonly used to refer to the inability to advance within a company for a variety of reasons, such as lack of a degree, race, etc. *See* Harvey v. Office of Banks and Real Estate, 377 F.3d 698, 703-04 (7th Cir. 2004). Accordingly, the Court cannot conclude that the use of the term in the context conveyed by the record should have put Caterpillar on notice that Gates was complaining of gender discrimination.

entry of summary judgment by presenting an affidavit that supplements or contradicts her sworn deposition testimony, during which she provided specific descriptions of her conversations yet made no mention of this statement. Precedent in this circuit clearly holds that "self-serving assertions without factual support in the record [or which lack an evidentiary foundation] will not defeat a motion for summary judgment." Jones v. Merchants National Bank & Trust Co., 42 F.3d 1054, 1058 (7th Cir. 1994); Lincoln v. ABN AMRO North America, Inc., 2000 WL 1745177, at *4 (N.D.Ill. Oct. 26, 2000), *citing* United States for and on Behalf of Small Business Admin. V. Torres, 142 F.3d 962, 967 (7th Cir. 1998).

Gates argues that her comment about things being different if she had been an "engineer" is indicative of sexual discrimination because "engineer" was shorthand for "male," however, this completely self-serving assertion barely passes the red-face test. *See* Miller, 203 F.3d at 1008 (noting that an employees subjective belief that her supervisors knew that her complaints centered around her belief of [sexual] discrimination is simply speculation and will not create the factual dispute needed to ward off summary judgment.)[2]

The closest that Gates comes to invoking gender are her comment to Richards in August 2001 that she believed that she should have the same salary classification as Heisel, who she believed performed similar duties in another area. Even accepting Gates' version of the August 2001 conversation, her complaints were general and stopped short

---

[2] This "engineer" comment is another improper attempt to avoid the entry of summary judgment by presenting an affidavit that supplements or contradicts her sworn deposition testimony, during which she provided specific descriptions of her conversations yet made no mention of this statement.

of indicating that the reason that she was not in the same salary classification was due to her gender. In this respect, her situation is similar to the plaintiff in Miller, where her complaints "concerned a general displeasure with being paid less than her co-workers given her longer tenure and the fact that she had trained some of them." 203 F.3d at 1008. And as in Miller, the Court must conclude that Gates has not produced "'evidence from which it could reasonably be inferred that [her employer] more likely than not' knew she was concerned" about sexual discrimination. Id., *citing* Senner v. Northcentral Technical College, 113 F.3d 750, 758 (7th Cir. 1997).

Moreover, assuming that the Heisel comment could have been sufficient to place Richards on notice that she was complaining of sex discrimination, that comment occurred approximately nine months prior to her suspension and ten months prior to her discharge. The Seventh Circuit has held that a four to five month lapse between protected expression and the adverse employment action negates any causal inference based on temporal connection. Filipovic v. K & R Express Sys., Inc., 176 F.3d 390, 398 (7th Cir. 1999) (finding four months too long); Davidson v. Midel fort Clinic, 133 F.3d 499 (7th Cir. 1998) (finding no causal inference where termination came five months after filing EEOC charge). Gates has therefore failed to satisfy the first prong of the test for establishing a prima facie case of retaliation under the indirect method.

Even assuming *arguendo* that Gates had engaged in some protected conduct, she cannot establish that she was performing according to her employer's legitimate expectations with respect to either her suspension or her discharge. As with her disparate treatment claim, she essentially admits to having made the number of telephone calls and internet hits indicated in Caterpillar's reports and does not contest that she made e-mail

contact with someone other than Richards through Caterpillar's computer network during her suspension and initially gave a false or deliberately misleading response when questioned about this conduct. Her attempt to introduce evidence of favorable performance appraisals does not change the fact that she admits having engaged in the actionable conduct that culminated in her suspension and termination and does not call into question the criticisms that culminated in her discharge. Thus, the Court finds that Gates has failed to create a genuine issue of material fact with respect to the second prong of her prima facie case of retaliation.

Finally, for her burden of demonstrating similarly situated individuals outside the protected class that were treated more favorably, Gates relies on the same evidence relied on with respect to her disparate treatment claim. For the reasons set forth above, this evidence is insufficient and cannot satisfy her burden under the fourth prong of the indirect method. Accordingly, Caterpillar is also entitled to summary judgment on the retaliation claim.

Although the Court must exercise caution in granting summary judgment in cases such as this, where intent and credibility are arguably crucial issues, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The Court has an obligation to remove factually insubstantial cases from its docket where "no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment." Mills, 83 F.3d at 846. After considering the record as a whole, the Court finds that Gates has failed to present sufficient evidence from which a reasonable jury could infer that her suspension and termination were either the result of unlawful discrimination based

on her gender or were actually imposed in retaliation for her having "complained" about her job requirements or salary classification.

## CONCLUSION

For the foregoing reasons, Caterpillar's Motion for Summary Judgment [#17] is GRANTED.  This matter is now TERMINATED.

ENTERED this 3rd  day of February, 2006.


                s/ Michael M. Mihm
                Michael M. Mihm
                United States District Judge